May it please the Court. Michael Minns for Richard and Fidelia Hounsermeier. Bottom line, the Hounsermeiers didn't get the same deal that the Thompsons got. This Court ordered that they get the same deal as the Thompsons. Counsel, the word in the mandate of the Court was equivalent to. And, of course, it can't be exactly the same because no two of the taxpayers are exactly the same. So the question is whether it's equivalent or not. Now, it looks to me as though the difference is that Hounsermeier and the other petitioners have to pay taxes from, what was it, 82 to, I can't remember the dates anymore, 88 to 95 or something. They have to pay taxes between the time that the settlement was made that was hidden from them fraudulently and the time the Commissioner said they're not going to have to pay during the litigation period. Interest, I meant. Interest, thanks. And it looks as though the difference is that the taxpayer with the secret settlement actually paid the money at the earlier time and the other taxpayers didn't. So why isn't it equivalent? Well, it's not equivalent at all. And I don't disagree with, I don't like it, but I'm not disagreeing or appealing based on Judge Begay's formula. The judge gets to fashion it. This Court ordered him to fashion it as he thought possible. The reason why, one, well, Hounsermeier's paid some interest, by the way. They're one of the few that did, which is one of the reasons why they were selected. The Thompsons paid no interest. They didn't pay any. The Thompsons never intended to pay interest. The Thompsons paid some interest after they got caught, and apparently of criminal conduct, too, after they made their secret deal. And they paid some at the last minute. And one of the checks they paid with was a bounced check. But the IRS didn't... But it's true that they didn't pay until they got caught. And it's true that they bounced a check. And it's true they got a deal so that they could pay when it was more advantageous to pay under the old law. Nevertheless, they paid. Well, that's debatable. We don't even have the 1983 return. But assuming that they paid something, which we don't agree with, Your Honor, that they paid their full tax. We don't agree with that at all. But assuming that, and going to Judge Begay's formula, first of all, they paid no interest after 1986. The Hunsermeyers, had they had the opportunity to settle on the same plan in 1986, would have taken it immediately. They had asked for it, and even not as good a deal, and it was rejected by the Internal Revenue Service. So the Thompsons paid no interest from 1986 on. What precluded them from paying? What precluded the Thompsons or the Hunsermeyers? The Hunsermeyers. Well, the Hunsermeyers, first of all, don't know exactly what they owe. It doesn't prevent them from paying. Pardon? It doesn't prevent them from paying. That is correct, and the Hunsermeyers could have, and if they, well, they didn't have the deal. And they had all this ill-gotten gain they're sitting on, so why didn't they just pay over the money? It's easier to call ill-gotten gain, I'm sorry, Your Honor. It's easy, and it's determined to be ill-gotten gain, okay? They're sitting on all this money, they could have paid, whether it was ill-gotten or not, they could have paid and let the government pay them interest. Couldn't they have? Well, yes, Your Honor, but No, they didn't. They have all this money and said they're using it. They're using it and they're investing it. They're making money off it. No, they're spending it on attorney's fees for 30 years. Well, that's a different, that's their choice. That's a different question. The point is they got all this money Who paid the attorney's fees? The Hunsermeyers have been paying and the other pilots, the other piggybackers have been paying for 30 years. The fact that Mr. Kirsting paid some with some of the monies does not mediate against that. 30 years of imprisonment on this case is something to consider. The Hunsermeyers are not in the same shoes as the Thompsons for one thing. The Hunsermeyers actually paid some interest before that. The Hunsermeyers thought they were required to pay interest and paid some interest. The Thompsons never paid any interest. Well, they're not going to be charged the interest they paid. I assume there's nobody arguing that they should pay interest twice. Well So if they paid interest, they get credit for the interest, right? No. The deal that was made with the Thompsons let them off interest in the future, let them have a finite amount of money in 1986, and let them get away with fraud. Wait, that's a little Who said that? A little odd way to put it. It let them off of paying interest after 86 because they had paid their 35 percent or so that was agreed on of their previously unpaid taxes in 86, and they had paid all the interest due. I guess they paid the taxes in installments later, but they paid all the interest, and they prepaid interest. It's not a special break of getting let off interest if you've paid it all. Well, no, they didn't pay the interest until they got caught. The Hunsermeyers paid the interest first. They paid what they thought they owed, and they made monthly payments on it. The Hunsermeyers made deductions on the returns for money they actually paid. The Thompsons were criminals. They never actually paid the interest. But if I could speak to the formula, too, assuming that this court goes with the formula, assuming the court says the IRS can stop interest at once and force the Hunsermeyers to pay interest when the Cravens don't, the court didn't give everything. The court's position was put everything on the numerator and the denominator. Denominator is every break they got. Many, many breaks. One break is $1,105.13 for their cost of court. The Hunsermeyers didn't get that. None of the people did. That should have been added to the denominator. The judge just eliminated it. Really, the case first came down from the circuit, Your Honor, saying that in excess of $200,000 was owed and a small portion was paid, which turns out the formula to be 86.66%. That was the first decision that this court made. It goes back after the second appeal to Judge Begay, and Judge Begay on the first day of... I'm sorry. I'm behind you here because you said something that I needed to check, and I think I still don't understand you. The first publicist case, Your Honor. You keep saying the Thompsons didn't pay interest. Not until they got caught. When I go through their settlement, it looks like after they got their break on the tax deficiency, the principle, the interest due was $59,545, and they paid it in 86. Actually not. In 87. The check bounced, yes, Your Honor. Then they got to pay it in 87, then they got to deduct it from the 86 when you could deduct 100%. If the court... They didn't pay it. They didn't pay it. It looks like they did pay it in 86. They got caught. They paid it. They made a secret deal. They didn't pay it all. A bad check is not payment. But then they made it good. Yes, they made it good a year late, but they got the 100% deduction for having paid it. The IRS says, well, take your bad check, make it good. Stipulate they're crooks. Let's stipulate they paid it late. Let's stipulate they didn't pay it until they got caught. Let's stipulate that they paid it with a bad check, which they later covered. Yes, sir. After we stipulate to all that so that we don't need the additional qualifying phrases, did they pay it or not? Put us in the same shoes then, Your Honor. Let us deduct it. If we have to pay taxes from 86 to 92 and the fraud was concealed, let us deduct it. We're paying past 86 just as they did. I still haven't gotten... They paid it late, and they got it to deduct it, and so they paid it in 86, which is 100% deduction. The law changed and didn't allow that. The numerator and denominator takes away the $1,105.13. It takes away $5,000 for unrelated deductions. My clients, the Hongsamiters, weren't involved in any other tax organizations. The Thompsons were involved in more than we can count. So the Thompsons got a blanket deal. You get off the hook for your bad tax shelters, and the Judge's Brigade didn't add that to the benefit, the Hongsamiters got because the Hongsamiters didn't do anything wrong. It said only the people that get benefit are people exactly like Thompsons who did something wrong. I'd like to reserve the last minute. Thank you, Your Honor. Counsel? May it please the Court.  I represent the Commissioner. Wait a minute. My understanding, we're going to hear from the appellants since they're on the same side. I only hear the same argument three times. That was my understanding, too, unless you all agreed on something different. I'm sorry. Is that okay with you? Yeah, that's fine. Counsel? Good morning, Your Honors. Attorney Robert Sticht for Rogers et al. Let me address your question, Judge Fernandez, first, if I may, to pick up on where Mr. Minns left off. Your question was did he pay the interest, and the answer to that is no. The reason the answer to that is no is because the tax law looks to the tax year. So in 1986, there's one tax year. The agreement was pay the interest and you can deduct it. Now, let's put ourselves in shoes of Mr. Thompson and Mr. McQuade at the time of the deal because what's happened here is the government and the tax court have managed on their remand to take what this court clearly ordered and to take it out of the mandate and to try to put it into the tax code. So what they did was they said, listen, this mandate only applies to the deficiency in tax, the tax alone. But then their own attorney got before the tax court and said, and this is in our brief, they argued to the court, well, look, the tax liability that this court erased, that portion, includes tax, penalties, addition to tax, which are similar penalties, and interest. And therefore, if this court had the power to I don't understand the interest. I thought what happened was Thompson got a terrific deal on his deficiency for being willing to be a fake petitioner for the IRS. He got out of his penalties. He got out of most of his deficiency, but he still was charged the interest, which he then paid, and he paid it with a bounce check, and he paid it so that it would be advantageous before the change in the deductibility of interest went into effect, but nevertheless paid it. And I gather from what Counsel for Hongersmeyer said and what you said that I'm wrong on that, but I still don't understand. Well, it's a red herring. It's a red herring, Your Honor. My point is the payment is a total red herring. Let's get back to the agreement, the illegal agreement that the parties made. If you're Mr. McQuaid and I'm Thompson's lawyer, DiCastro, we don't have to look to the tax code to reach an illegal agreement, and that's what happened. And if we stray away from that agreement and what this court said in the Dixon 5 case was, give them the Thompson settlement per the agreement. That's why we spent so much time in our brief saying, listen, the error by the tax court is not enforcing the agreement itself. And one of the main terms of that agreement, and we all would agree under contract principles, which is what a settlement is in a tax court case, under those principles, you look to the material terms of the contract. And the material term was its enforcement date. That's why the payment becomes a total red herring, because they get together in October of 1986 and they agree. Let's agree with you, Mr. Thompson. What do you want to do? Now, put yourselves in the shoes of Mr. Thompson. He doesn't think about tax on one hand and interest on the other hand. What these taxpayers think about is, how do I resolve my total liability? My lawyer is telling me I've got to do this. So they give him a package deal, and that's what McQuay did. That's the agreement. It doesn't have to comport with law. To the extent that it does comport with law, the tax court said, okay, he took the deduction and he didn't pay it, but he didn't get the advantage of it, so therefore it's not illegal. Therefore, he had enough money on store at 1286 after his new agreement. He had enough money on pay where it would cover that deduction. That's irrelevant, because that has to do with whether or not the agreement is legal. And therefore, if it's legal, the tax court reasons. Therefore, it has to be not an extra benefit for Mr. Thompson. But if we make the agreement, Mr. McQuade and Mr. Thompson's attorney, and we agree that Mr. Thompson can pay whenever he wants to, and he can deduct that interest, forget the deduction. He will pay it and he can stop the interest. This would be a good issue if what had happened was Rogers paid in 87 and he said, why don't I get the deduction I would have gotten if I had paid in 86? That's what he did. Thompson paid in 87 and got the deduction. Did Rogers pay in 87? Did Rogers pay in 87? He paid a few years later. Did he pay in 87? No. I think the hypothetical Judge Kleinfeld has posed said it would be a nice question if it's 87. But if you're talking about payment like 20 years later, it becomes a very different question. I've heard a lot of talk, but for the life of me, I can't figure out why there's not time value of money. And if somebody has paid 20 years before the other guy, why doesn't that get reflected someplace? Well, because then we're straying from the Dixon 5 mandate. The Dixon 5 mandate said, listen, we don't even know. Judge Wardlaw looked out there and said, we don't even know if you can figure out what this Thompson settlement is. But I want these people to get the same deal. That means the same position. Didn't say same. She said equivalent. Equivalent. That's different from same. Same position. Put them in the same position. Your discretion, Judge Begay, goes no further than to put Mr. Rogers et al. in the same position. And the only way to do that is to enforce the terms of the contract. But it's not the same if one person gets to use the money for years and another person doesn't. My client didn't have that lost opportunity cost. You want to talk about the time value of money, you've got to look at the economics of the lost opportunity. Well, your client could have made a deposit, could have paid taxes in 1986, 1987, 1988, most any year, and chose not to. He thought he was going to win. He was wrong. No, he wasn't wrong. He could have paid under protest. He was wrong. He never won on the tax shelter element. He hasn't had an opportunity. My offer of proof was denied. The court made very clear that it wasn't ruling. The reason that the taxpayers prevailed in Dixon V is that the court determined that they didn't have to demonstrate prejudice. The court wasn't going to go to the tax shelter issue. We can't take as a given that the taxpayers would have won on the tax shelter issue. And I have to say, having looked at it, I am highly skeptical. Leave that aside. The difference is that one party paid, the other party didn't, and I'm not sure how we're supposed to disregard that. Money has time value. And your client had the opportunity to make a deposit earlier and elected not to. Because it's perspective. If you put me in the same position as Thompson, my perspective is looking forward to 1996. If your client thinks he's right on the tax shelter, then he should fight the tax shelter issues. He did. He thought he had a fair fight. He hasn't gotten here. This court said he didn't get a fair fight. But can this court require your client to take the Thompson settlement terms? If your client's right, then your client doesn't win whatever percentages you're advocating for. I've lost track of who's who. Actually, we've lost. Your client wins 100%. Judge Clifton, our clients have argued in our brief that my clients are entitled to the zero settlement that Alexander got. Is yours the zero? I've lost. Yes, sir. I've got a 90%. And he's arguing that if you really want to speculate on that tax shelter, on how legal it was, we know as a matter of substantive law that it has to do with economic substance of the transactions. Now, Rogers went before the tax court and he said that was decided. I thought that was decided. I thought the legality of the tax shelter is off our table. Are you telling me that's wrong, that that issue is still to be debated? And if it is, go to the tax court and follow your petition on it. Well, the decision the tax court entered ignored the offer of proof on the economic substance. I'm not talking about the decision that it entered pursuant to our mandate. Well, that's going to be final if we go back to the tax court. Of course. We need your order to go back to tax court to try that. No, Counsel, I'm sorry. There was a merits decision in this case, and as far as I know, that has never been overturned. It's been vacated. The merits decision that decided this whole case, aside from putting your folks in the same position, still stands, I believe. It has been vacated. I'd like to speak to the delivery process. I thought the Kirsten case decided that the whole thing was phony. Kirsten case? Right. That has no collateral estoppel here. Not only that, but if this trial was unfair, you can't hold that against my clients that they didn't get a very fair trial. We said we weren't going to set aside the whole trial, did we not, in our mandate? We said we're not going to set aside the trial. Actually, what this court did in two steps was they vacated and then they went to the settlement, Thompson Settlement. They asked these counsel who were here, what remedy do you want? And the counsel said the Thompson Settlement. On the deliberative process privilege, Your Honor, we're asking for those documents to be turned over, which are known as Item 123. Now, I think what's important for the court on the Item 123 documents is the way in which you analyze the standard. The balancing test is not the appropriate way to go about this, and I would cite the court to the In Re Sealed case, District Court of Appeals cited in my brief, as analyzed in Alexander. I'd like to reserve the balance because of rebuttal. Thank you, Your Honor. Thank you, Counsel. I'm the third appellant, Your Honors, and what I find disturbing about what I hear on the argument is that somehow the Court of Appeals draws a distinction between the rich and the poor and decides that the rich can't be cheated, but the poor can. What's at issue in this case is not equivalent. It's not equivalency. That wasn't what the basis of the Ninth Circuit opinion was, with all due respect, Your Honors. The basis of that opinion was you cannot allow the government to benefit from fraud. Because if you do, if you allow them and the witnesses that align with them to benefit from fraud, you're going to encourage fraud. And that's a bigger principle than any tax shelter that was ever disallowed. That's absolutely right. That's a bigger principle than any tax shelter that was ever disallowed in this country because you don't have a fair system to argue them, and you don't have a fair system to decide them if you lose sight of that principle. Now, that being in mind, to answer one of the judge's questions, no, Judge Goff's opinion never was final, and no, it never was applied to anyone. And I was the attorney, that fool for a client or whatever you want to call him that was there for those six weeks in Hawaii that that case was tried. And I sat there and watched with amazement as one of the test cases got on the stand and committed testimony and put in testimony that could have put him in jail. Yeah, the interest deductions on the promissory notes were a fraud. The interest on the promissory notes were a fraud. That's what Thompson testified to. Why did he do that? Because he already had the fish in the barrel. He already had the ducks in the oven. He knew how his case was going to be decided. Now, there's only two issues practically in this case. If you want to prevent fraud and you want to keep people from doing this again, if you want people to do this again, then cue to that idea of equivalency and we're going to see how bad people are cheated and we're going to see what they did with their money when they were cheated. Let me know. Stop, stop. Yes, sir. We are trying to apply the mandate of our prior decision. What you are trying to do is re-argue that case. No, no, sir. Stop. What you are trying to do is re-argue that case by saying the only way to do it is not go to this equivalency, which is what the mandate talks about. No. And what you've argued this morning and what you've argued in your brief is pointless. Now, if you want to take the next 7 minutes and 30 seconds and spend wasting your time and wasting our time, go ahead. But I'd appreciate it at some point if you'd let us talk about something that's relevant to what we're doing here today. I'm talking of two issues that are relevant. It sounds like we already lost before we got before this Court. It sounds like the Court already had predisposed determination of some of these issues. I beg the Court to reconsider. The issue was decided, as Mr. Stick said, on contractual grounds. And the issue previously was the government must not benefit from its fraud. I personally argued that issue twice. I argued it in the deframed case, and the Court didn't make it part of that decision. And I argued it in the second case, and it is part of that decision. It says truth needs no disguise.  Or someone didn't have a bunch of money, and they were cheated. Or they didn't put their money out of interest or go gamble in the stock market and lose it all or become millionaires. That's what's irrelevant. Thank you, sir, for that. I hope you understand that principle. And now what I'm looking at is the interest. And I'll have a few more comments on this, hopefully. But the interest here is generated, and this is a very interesting issue. It's generated by the delay caused by the fraud. Because the first question we need to reach is not all these other things about what they did with their money, but the simple question is, would there have been interest charged for 1985 through 1992 if there had not been a fraud in progress? And the answer is no, because the cases would have been over. There would have been interest because they hadn't paid whatever the Court decreed that they paid. And so that's the point here, and that's within the contract. And the issue here is very simply, but for that fraud, this interest would have not been generated. And for one of the first times, you have a distinction here that's clipping. Back up to that. Why would they not have owed any interest had the government not? The case would have been over with. They wouldn't have owed any interest with undecided decisions. They couldn't use the excuse of our decision is not decided, so we have to pay. That's the point of the matter. The issue of interest occurring after the decision is over with is one thing. A lot of people pay under protest to avoid the running of interest and penalties. That's just an option. Yes, a lot of people do that. But you want to set options and say, you know, I'm going to let them commit fraud if these people don't take their options. If these people don't take their options and figure out what's going on before it's disclosed to them, I'm going to hold it against them. You don't mean that, do you? They had a whole bunch of airline pilots deducting phony interest and cheating on their taxes. But, Your Honor, you can't say that. There's no judicial decree against these people. You're displaying bias. They have a right to a trial before you make that decision. We're on the wrong foot here. They had a trial. And as far as the records are concerned for Thompson, our theory is he gave all the money back. The government gave it all back to him that he ever paid, so he only paid 2%. If there was a trial, we wouldn't have the audit records of Thompson on this. They said they destroyed him. $1,000, didn't he? No, I think he gave it all back. He didn't pay for 82, 83. That's laid out in my brief. He didn't pay for 82 or 83. The point is, please protect your equitable jurisdiction carefully. And please don't be a slave to the statute. Because when this country was founded, we had the king. And we had the conscience that the country was the king. And it passed to the jury, but it also passed to you and your equitable jurisdiction. And it's important here that fraud not be benefited. I'll reserve. Thank you, sir. Counsel? I'm John Dudak. I represent the commissioner. I apologize for the earlier mix-up. If possible, I'd like to turn to the terms of the Thompson settlement first and then discuss the interest issue. Now, in the prior appeal, this court ordered the tax court. I think we're at a bit of a disadvantage, because the fraudulent nature of the deal that the IRS entered into with Thompson has led to a record where it's hard to just look at a document and say, this is the settlement. Do we have something in the excerpts where we can just look at it and see precisely what the words are? Well, the tax court, in its opinion, outlined the settlement. I know they do, but I mean firsthand, because I understand part oral, part written, two different times. Your Honor, I think the tax court, in its opinion, does a good job of sketching out the background. I hope so, but I'd really like to read the deal between the IRS and Thompson. As far as I can tell, I can't. I have to depend on the tax court's statement of it. Is that correct? Well, that's correct. In the government's brief, I think we provide, in our statement of facts, we provide record references. I don't like to just take what the government says is true. I like to look at the document myself and judge what the government says is true. I'm pretty sure this is in the record. I'm pretty sure. Can you tell me the page number? I cannot, but I could send a letter to the court to tell you. Well, this was really the time. We'll give you an order if we want more from you. Okay. Sorry. The tax court was ordered by this court to basically give the taxpayers the equivalent of the Thompson settlement as a sanction against the commissioner for the misconduct of his attorneys. On one hand, the tax court did what it was ordered to do. First, it ascertained what Thompson got under the settlement, and then secondly, it put the taxpayers to the extent possible and practical in the same position as Thompson. And it's our position that the tax court did an admirable job on Woman in carrying out this court's mandate. One of the complications is that Thompson's had other things going on, and the tax court went through and made judgments as to what should be included or what should be credited for the other taxpayers and what should not. Part of the focus of the taxpayers' attack has been on some of the items that have been left out. Justify why they should be left out, why the taxpayers shouldn't be able to include the other benefits they allege that the Thompsons received and have that included within the percentage calculation of what the benefit to the Thompsons of the settlement was. Do you have a particular one in mind? Well, I mean, there's a laundry list, right? I have trouble keeping straight in my mind which is which. Some of them operate by a principle. Let's take, for example, that Thompsons were involved in other transactions and got some benefit in effect. What the tax court said is that, okay, all the penalties and charges for the other transactions will all be wiped out. That's a benefit to the Thompsons. If you have another taxpayer that doesn't have any other transactions that are suspect, they don't get any benefit from that. Why shouldn't that be included in some fashion into the percentage calculation? But this is the way the tax – I mean, this was a rather complicated matter, and the tax court had to – the tax court had to go through, evaluate each issue. Some of them it made adjustments to the settlement fraction. Other ones it didn't. For example, if the taxpayer had another tax deficiency item that didn't relate to this tax shelter, then they were relieved of that, and that applied to all of the taxpayers. That seems almost perverse in some fashion. It says that a taxpayer that has other transactions that are called into question may get additional benefit, as the Thompsons did. Right. And a taxpayer who does have no other transaction called into question, who otherwise has played it straight, doesn't get any benefit from that. That's correct. It seems to me, if anything, it might have been more logical the other way around, that why should somebody – I mean, suppose you have another taxpayer involved in this shelter, a column Jones, who had all sorts of other abusive deductions, and because he happens to be caught up in this net, he gets the benefit, as the Thompsons apparently did, of having penalties and charges for everything else waived. Whereas somebody else who's played it straight otherwise gets no benefit from that. The tax court could have alternatively figured out the financial benefit, just include it as a dollars and cents item instead, because that's in the end, we're all talking about dollars and cents, and said for Thompson, okay, Thompson, you should have paid X, you had to pay Y, that's my numerator and denominator, and we'll apply that across the board. Instead, it comes off as this hybrid, suggesting if you're involved in other bad transactions, you'll get off the hook. Well, I understand that's one way of doing it, but why isn't that kind of illogical? Because it rewards somebody who's involved in other bad transactions. I understand what you're saying. In a couple instances in the tax court's opinion, it did make specific adjustments relating to the Thompson settlement and gave it to everybody. But we're talking about tax shelters that have over 1,000 taxpayers. So it would have been very difficult for the tax court to go through and look at the situation of 1,000 different tax payers. What it shows to do is say if there are other penalties and charges, they're just gone. They're gone. So Jones, whose facts are not in front of us, who happens to have these other disputed tax shelters or claims, he gets a benefit. He gets a benefit. And the tax court, I understand, can't go through all of them and figure out one at a time. But what it shows to do is give a benefit of sorts to the person who has other potentially abusive deductions and no benefit at all to the people who don't, whereas you could have just done it in a dollars and cents fashion, say that the bottom line for Thompson is that he benefited X, and we'll just use that percentage formula and not pay any attention at all to whether there were other transactions going on on the return. I agree with you, Your Honor. I will say that this Court's mandate gave the tax court the discretion to come up with, to the extent possible and practicable. I'm not exactly sure how to handle standard of review, because while abusive discretion is often the test when we review the tax court, I think we review de novo ordinarily on whether a lower court has complied with our mandate. I think that's correct, Your Honor. But I'm saying here that this was a rather difficult task. Difficult doesn't mean we affirm. Oh, right, right. But the tax court, it's a gigantic record. The IRS got itself into this, and maybe it should have just simplified the task some by figuring all the benefits of Thompson. Judge Clifton has mentioned one of the bigger ones, which is the deal he got on all his other cheats. Another one that has bothered me is he got the benefit of the earlier law on deductibility of interest, and although the others didn't pay the interest early, they also don't get the – when you come right down to it, Thompson didn't either. He used a bad check, but he still was given the benefit of the earlier law, and the other taxpayers don't. And I don't know exactly how to do it, but I wonder if it's really equivalent if the other taxpayers don't get the same benefit he does on the old law, maybe by having their principal reduced commensurately. The tax court pointed this out in its opinion that the law had changed, and it was difficult to put everybody in an identical position because of that fact. It's difficult. It's not a get-out-of-jail-free card. But I think the tax court was convinced that the time value of interest, that people who paid it, they were all coming out in the wash with respect to the interest. If you paid early, then you'd get a refund, essentially, from the commissioner after the Thompson settlement. But if you paid later on, then you would owe tax because you had the use of the money for all of the years. Was anything done by the tax court – and I, at one point, knew this, but I've lost track – Thompson purported to pay in 1986. He didn't actually pay all in 1986. There was a bad check. There was some – There were two checks. One of them was good, right? The other portion wasn't paid until 87. But I think there was enough money there to pay for the – to pay for 86. There were two checks. Are you saying that Thompson did, in fact, succeed in paying what he owed in 86? Well, we argue in the brief, Your Honor, that yes, that there were two checks. One of them was enough to cover the 86, and the second one bounced. And he later paid – he later submitted a new check that was good. And my recollection is he had to pay additional interest. That's the question I'm getting to. The portion that got paid in 87, did he, in fact, pay the amount of interest that would have been, if allowed to accrue, to the point of actual payment? I thought – yes, Your Honor, I thought he paid catch-up interest. Did he get the benefit of the old law as though he had given a good check for the second check's amount in 86 instead of as was true in 87? Do you understand what I mean? He thought – for 1986, I thought he got the benefit. The tax court cited opinions. I think – I think what happened is he got the old law benefit from paying interest as though he had paid it in 86, even though part of it wasn't paid until 87. Right. And then for 87, when he rewrote the check, he had to pay catch-up interest. And he didn't get as much as a – he didn't get – the interest deduction was cut back for 87. And was it cut back for the rubber check that he replaced? That I don't know, Your Honor. I don't think it was. Because I know the tax court also made a later adjustment in its opinion for – for a later year that they claimed an incorrect amount of interest, and the tax court made an adjustment in its settlement formula to account for the fact that that was improper. Okay. With respect to the Thompson settlement, much of what the taxpayers were asking is they want more than what the tax – they want – they don't want what Thompson got. They want more than what Thompson got. For example, the Hansmeyers are arguing that the Thompson settlement should be a 100 percent reduction in the tax liability, but that goes beyond this court's mandate. This court stated in the prior appeal that it would not eliminate all of the tax liability. So in order for this court to do that, it would be – or in order for the tax court to do that, it would have been going beyond the mandate of this court in the prior appeal. Also, many of the arguments that the taxpayers make in that regard about a 100 percent reduction in tax or a 90 percent reduction in tax, the Hansmeyers, they were not arguments presented to the tax court. So for that additional reason, they shouldn't be considered here. The law of the case – I'll skip over to the interest deduction. The law of the case also applies to the interest deduction. Thompson paid the interest. He didn't get a special benefit or concession on the interest. So to the extent that the taxpayers here are asking for forgiveness of the interest, that's something that wasn't part of the Thompson settlement. The tax court's mandate was to apply the Thompson settlement, and the taxpayers are basically asking for something that goes beyond the Thompson settlement. The way I understand it, tell me if this is right, is that when you come right down to it on Thompson, the IRS did not forgive a nickel of interest. Instead, what it did was it cut the principal amount down arbitrarily and without much excuse, just so that they could use Thompson as a secret stooge on the – pretending to be on the petitioner's side. But they cut his principal down, and he paid every penny of interest on the cut-down principal. Is that the way it works? Yes, Your Honor. Basically, the settlement was to fund attorney's fees for the – to pay Thompson's attorney's fees. So the equivalent would be to cut principal down for the other petitioners to an equivalent amount and have them pay every penny of interest. So the tax court – the 67% or 67% settlement figure then basically reflects the deal that Thompson got. And the question really is whether knocking off two-thirds knocks off enough. Well, and then the tax court also knocked off any – as we've discussed, knocked off any penalties in interest, knocked off any other tax deficiencies that were on the table for the taxpayer. In addition, the commissioner made the concession on interest in which on the remaining tax liabilities, the 37% remaining tax liabilities, there's no interest starting in June of 1992. Is that still running, by the way? I'm sorry, Your Honor? Is that exception still running? It ran from 1992 until the date that a decision is entered in a taxpayer's case. Then it starts up again under the commissioner's concession. It's not running as we speak. Is that correct? Well, the tax court decisions for these taxpayers have been entered. I think for the other – you know, for other taxpayers that are piggy-banked onto the Thompson settlement, it presumably hasn't started. Let me ask you another question. It's a little awful we've been talking about. Your opponents indicate that there is no judgment that there's anything wrong with those tax shelters as far as these people are concerned. Is that accurate in your view? I think it's accurate to believe the tax court did write a decision on the merits. I think it was back at the time that this came out. It was, what, the late 80s or early 90s? Yes. And it went on appeal to the Ninth Circuit the first time it was remanded. Yes. Okay. And then it came back up the second time in the Dixon appeal. And the merits of the tax issue was briefed at that time, and the sanction issue was briefed at that time, or the structural defect issue was briefed. Yes. Okay. So the Dixon panel in its decision did not explicitly rule on the merits of the tax shelter. It vacated it. But implicitly, none of this would make sense unless the court implicitly agreed that the taxpayers were liable for the deficiencies. So your view is that... That they're liable for the tax deficiencies. Your view is that the merits determination hasn't been made, in effect, by implication in the way this court decided to remedy. Is that correct? It appears to me by implication. When I look at the Dixon opinion, my recollection is that I don't see a ruling on that issue. As was pointed out, though, in the Kirsting decision, which the Ninth Circuit decided, there was a ruling in that case that these are bogus tax shelters. Sure. But we know that they're not exactly bound by that. That's not the identical case, but my recollection is that the fact that the tax shelter programs were the same programs that were before the court in Dixon. So if they were to go back to the tax court and say, well, okay, the court's now decided all this funny stuff about deductions and interest, but you know what? It's never decided the validity, and indeed, since it vacated the judgment, there's no judgment. And the tax court said, whoops, and issues a judgment. Then what? In your view, can it then appeal the merits of the underlying holding to us? Well, the tax court has entered a decision. It entered a decision blind in these cases, and presumably if the taxpayers wanted to appeal the merits in these cases, if they wanted to appeal the merits, they could have put that in their opening brief. As to all the other folks who are sitting out there who don't have the misfortune of being lead folks, other folks, they can now say, perhaps, you know what? We're going to appeal the merits now. Well, I thought these were the test cases. I know they're the test cases, but what does that mean? So the other people were bound, most of the other people were bound by piggyback agreements. They agreed to be bound by the outcome of the litigation in the tax court. So if there was a merit issue still remaining when the tax court reentered these judgments against these plaintiffs, taxpayers, if there was an issue, they should have appealed it now. And having not done it, it's waived, and therefore the merits issue is decided. Is that your position? What's your position? That would be my position, that they've waived. Thank you. That they've waived the merits issue. And is the waiver by these taxpayers, what impact does it have on the piggybackers? Well, presumably they would be bound. I mean, they did have a trial on the merits in the tax court, and the tax court ruled against them on the merits. And then at the time notices of appeal were being filed, that's when the commissioner went to the tax court and asked for a hearing on this alleged misconduct by the commissioner's attorneys. And that prompted the remand by this court then in Defresne. I take it that's an issue for another day then? And as it goes back and the other folks say, wait a minute, we didn't agree to piggyback for these characters to go and waive the whole merits issue. We still think it's outstanding. So they can raise that, I suppose, in the tax court and say, you know what, it's not decided in the tax court to decide whether it is or not, and we'll see that again. Is that correct? I just don't know. It would be speculation to decide what would happen at this point. Okay. But if they're bound by the piggyback, then they're stuck. If they're not bound, your answer to me was, well, they've got piggyback agreements. And my question to you was, well, that's just another contract, right? It would seem to me that in general the answer would be you should be bound by the piggyback. I understand your position. Thank you. Now, this is off the top of my head. I have not researched the issue, right? Which is why it might be a question for another day because we haven't either. But that's the posture you anticipate under the circumstances. Yes, Your Honor. Okay. Thanks. You can log in sitting down if you think you want, and we haven't asked you any more questions. This is a minor point, but in the Hogsmeyer's brief, they mention the tax court's subsequent decision in a related case called Hartman. And I'd just like to point out that there was a supplemental opinion issued by the tax court in that case in 2009. So any further questions there? Thank you. Thank you very much. Counsel, you reserve some time. Yes, Your Honor. May it please the Court. We followed motion not to be joined, but we were overruled. That's why we're here together. Some of the parties have different positions and different views. Judge Clifton has spoken to the primary argument that I have raised in the Hogsmeyer's brief, and the government has ceded it practically. There are things that Thompson got that we didn't get. One of them was $1,100 for their six weeks in Hawaii. It's incredulous that it only cost them $1,100, and I doubt that that's an accurate figure. But we want every penny of it, and it should be added to the denominator. The other is the $5,000 for phony home interest loans that my clients did not get involved in. I apologize if I got upset when the Hogsmeyer's were compared to the Thompson's. The Hogsmeyer's thought this was a real court. They thought it was a real day in court. The Thompson's did not. The Hogsmeyer's were trying to follow law. The Thompson's never tried to follow law. On the interest question that the Court raised, they got a payback to 1986. All the money was counted in 1986. There was a carry forward into 1987 because they didn't need the use of all the interest. None of us have gotten any of the benefit of that. Judge Kleinfeld, to the full extent that they got it, we should get it. Your clients have made a payment in 1986. Everybody knew the law was changing. I remember it well. I was a taxpayer then. Was the option there to make a deposit so that interest would stop running at that point? My clients didn't have the excellent counsel of the Internal Revenue Service, Mr. McWade, who the Thompson's were dealing with directly, complaining about their own attorney with, so they had the free government counsel helping them, rearranging their affairs to move everything. And, yes, had they been properly advised, they would have done more. They would have paid more in 1986. They weren't properly advised, and no one that I know of, we can't find a single case where anyone got a hot check that got to move them back to 1986. And if that's the law, I have a number of clients who would like to take advantage of it. When the case was closed, they got it. As I flip through it, it appears to me that piece was added. The tax benefit, 1,000-some-odd, 1624, is part of the denominator. Well, what I believe, I believe the full benefit is that they could get all their taxes paid that they paid in 1987. And I don't believe that, Your Honor. I may be mistaken. I do not believe that in the, that would let, on the close of the case, that every client would get to decide how much interest we want to pay at a defined time and get it deducted. They were allowed to deduct interest in 1987 under the 1986 rule. It dropped to 65% in 1987, and you cannot deduct personal interest today, which was one of the primary layers of the program. People were deducting personal interest. The Thompsons didn't pay it until they got caught. The Hansenmeyers were actually paying personal interest, which puts them in a different class. They'd love to be put in the same shoes as far as receipts as the Crooks did. There were honest people involved in this program, and there were people like the Thompsons who committed perjury on their tax returns and who had comfort letters saying that they weren't ever going to have to pay their notes, and then there were people that had to pay their notes. So the taxpayers wanted to pick the people who had the best case to put on before the tax court. The government wanted to put the people who didn't, and they got to Thompson. Thompson threw the case. It was to his benefit to do so because if he says, I don't owe this money, it's all fake, then he doesn't have to pay the note either. So he got the tax benefits, and he didn't pay the note either. Thompson is a crook, and it's disappointing that he's praised in the decision by Judge Begay. Thompson is clearly a crook. He's as crooked as the two IRS agents, lawyers that were crooks, and also DiCastro, his lawyer, who knew what they were doing. The lawyer has a duty to disclose unethical conduct or these things to the court, even if his client or he has an obligation to withdraw. None of these people suffered anything. Counsel, you are over time. Sorry, Your Honor. Thank you. Thank you, Counsel. Thank you, Your Honor. If I may address this question one more time about 1987, Judge Clifton said it might be a better case. If you just recall, they thought this thing would be resolved in two years, and I think what this question comes from is the idea that this is going to be 17 years they don't pay. The truth is they think they're going to win the case. They think it's going to be resolved in less than two years. So from 86 to 88, they had a trial in 87 scheduled, and that trial then got bumped. Mr. Eisen came in the case in 1988. They had the trial in January of 1989. As far as they knew, everything went fine. So that two years is kind of critical. If you're going to speculate about that, I think it's important to think that that interest really wouldn't have run more than a couple of years if this thing had been a slam dunk for the government, no fraud. And they resolved the case. Another major point. They would have paid the money. And the reality is that they haven't paid the money. Some did pay. And they would have gotten the benefit of paying. There were some distinctions. The ones that don't, we look backwards now at a perspective of, let's see, 1987, 23, 24 years. At some point in time, I guess it's 1992, the IRS voluntarily says, okay, no more. And so the money has been held interest-free by the taxpayers from that point until, I guess for your clients, whenever the tax court ruled and so forth. A period, we're talking, what, 17 years of money being held without the time value of the money being reflected, without interest being charged. I'm not sure I understand how that's a disservice or unfair or not equivalent if, in fact, they're called upon to pay interest for the 1980, what, 86 to 92 period, the six years there. Many of my clients are going to be getting refunds. It's not 17 years. And you were correct to point out there are differences among the taxpayers. And the tax court tried to say, you know, this is difficult because there are these differences in the taxpayers. And the truth is, it's not 17 years. That's why I'm trying to make this point. I think, realistically, there are people that have paid. Now, there were some estimates done. You brought up also about the non, you know, the shams that other people, some of the pilots may have been into. The truth of the matter is, there was record evidence of that put on by Rogers at the last evidentiary hearing. That's really what prompted the court to throw out those things, because to try those issues that were non-cursing issues so late as today would be unfair to the parties, both parties, to resurrect that evidence. But at the same time, the government made a lot of mistakes. And I have personally seen, I'll represent to this court, there are files that reflect those mistakes that we've corrected, where those non-cursing issues are really not issues at all. So we can't make this assumption about all the shams out there. But I think the more important point is just that. Counsel, you are over time, so you ought to wind it up. Okay. If I may address one of your points, Your Honor? May I have leave? Please. Thank you, Your Honor. I think the denominator is the way to go. The denominator is the way to go, because then you don't get to the interest issue on 6601. Thank you, counsel. Thank you. Overlooked in this argument in one very main issue is whether or not IRS has the ability to abate interest from 92. And they said they did not. And based on their brief on page 43, they did not. So how was it that they were able to abate the interest from 92 but not 1986? The answer is there was already an abatement of equitable interest, or to put it a different way, an equitable abatement, because this whole thing stunk and the court gave an equitable abatement. So all we're arguing for is more years. And as far as the IRS, they didn't appeal that. If we'd been in the context of another case where the court had awarded it without the IRS's permission, you'd be in a situation where they'd be here appealing, saying that we didn't have any statutory authority to do that. So one of the main bases of my argument to you is your equitable jurisdiction is precious, and it must be protected, because the very rare instances that occur where a statute can be used as fraud, can be used to create fraudulent benefits for someone. At the time of the revolution in this country, when you subsumed King George's powers and you became representatives of the people who took his powers, you also took his conscience and the conscience of his chancellor. And this is one of those rare occasions where the hand of the court has to reach out and scrape back those benefits that they received. And is that within the equivalency? You betcha. Because it's not an issue of what Thompson received in the form of how he paid interest. It's an issue that Thompson, by his conduct, subjected everybody else to fraudulent interest. There wouldn't have been any interest for Thompson's fraudulent conduct. As the court has pointed out, in the normal course of tax court, the case would have been over within three to six years. So with all due respect, that's where you're getting it wrong in that theory. And now the other point here is, and I'll be brief, on our page 24 of our brief, we have a calculation as to what the real tax savings were. And we've estimated this based on our best reading of documents, which are incomplete. But for 1982, with $8,859.81, that I think were the tax savings Mr. Thompson got for not paying on cursing deductions, and the $19,717.99 for 1983 he didn't pay, you get a $28,577.80 to apply against his $30,000. So that's where we get our 2%. And yes, I'm demanding that all of his benefits, I think it's equivalent that not only do we get the benefit of what Thompson received in his years before the court, but we get the benefit of what he received in the cursing shelters for the years outside the court, but within the IRS's jurisdiction. Because you can't give these agencies the ability to punish and to reward taxpayers in that manner, naked of the equitable principles that bind you as a court. You must protect the taxpayer. It's your job. If you don't do it, nobody else is going to do it. So that's the reason for the argument there. It must be clear that when they destroy records and they say, well, gee, Thompson, we don't have his 78 year. We don't have his 86 year. We don't have his 87 year. It's deemed that whatever is in those records support our case, support the taxpayers. Omnia presumuntum contra spoliatorum. That was a principle engrafted in our cases since Justice Marshall. And so that's what you have here. And, yes, it's a jail. It's hard to get out of. But if you destroy records as they do taxpayers in the summons cases, you may never get out of jail. So that's the way it is for the IRS in this case. And we have a lot of problems. And this decree that the court gave was not enough to file a mandate and to relieve the people of all the burdens that Mr. Thompson's fraudulent conduct caused, as well as to give them the benefits. Thank you very much. Thank you.
judges: Fernandez, Kleinfeld, Clifton